## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                  No. CR 03-1890 JB

JUAN MORALES-ORTIZ,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Juan Morales-Ortiz' Motion to Suppress, with Supporting Authorities, filed June 7, 2004 (Doc. 122). The primary issues are (i) whether the protective sweep of the Defendant's home was lawful in execution; (ii) whether the agents lawfully searched the pager and the cell phone; and (iii) whether the search warrant executed by the agents was based on probable cause and, if not, if an exception to the general warrant requirement applies. Consistent with the Court's ruling at the hearing on this motion and the reasons for that ruling given at the time of the hearing, the Court will deny the Defendant's Motion to Suppress.

## FACTUAL BACKGROUND

### I.  THE PROTECTIVE SWEEP AND SEARCH AND SEIZURE OF THE PAGER AND THE CELL PHONE.

On October 7, 2003, at approximately 6:10 a.m., Drug Enforcement Administration ("DEA") agents attempted to execute an arrest warrant for Morales-Ortiz at his residence at 1800 Basswood Ct. NW, Albuquerque, New Mexico. See Transcript of Motion to Suppress Hearing at 9:7-9 (Agent Marcus West, Drug Enforcement Administration agent); 11:19-21 (West)(September 3,

2004)(hereinafter "Tr. Mot. to Supp.").[1]  The warrant alleged violation of 21 U.S.C. § 846.  West, the leader of the team, executed the warrant based information that 1800 Basswood was Morales-Ortiz' residence.  See id. at 9:7-9 (West); 18:13-21 (West).

West's team knocked on the residence's front door for approximately one hour in an attempt to gain entry into the residence.  See id. at 12:4-6 (West); 44:24 - 45:6 (West).  During this time, on at least three occasions, an unidentified male opened the front door and spoke with the agents.  See id. at 13:12 - 14:13 (West); 16:11 - 17:11 (West); 19:2-4 (West).  Although the front door was open, the agents could not identity the person with whom they were speaking because the screen door, which remained closed, had a pattern through which it was difficult to see.  See id. at 10:24 - 11:18 (West); 14:14-22 (West).

Even though the view through the screen was obscured, West was able to discern colors.  On one occasion, West observed a person with no shirt, and later noted that the person at the door wore a white shirt.  See id. at 70:13-20 (West); 77:2 - 80:1 (West).  When arrested, Morales-Ortiz wore a blue shirt.  See id. at 77:2 - 80:1 (West).  Although the agents were able to conclude that the person or persons with whom he was speaking was male, it was unclear if it was the same person.  See id. at 72:9-19 (West); 74:13-16 (West).  When the agents asked to speak with Morales-Ortiz, the unidentified person at the front door denied that he was Morales-Ortiz, stated that he needed to call Morales-Ortiz, explained that Morales-Ortiz was upstairs sleeping, and told agents that Morales-Ortiz was at work.  See id. at 15:3-12 (West); 16:13-23 (West); 20:2-15 (West); 42:5-16 (West).

While agents attempted to gain entry through the front door, another agent, Veronica Franco,

---

[1] The Court's citations to the transcript of the Motion to Suppress hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

observed a man in the family room through a side window, and positively identified him as  Morales-Ortiz.  See id. at 20:17 - 22:18 (West); 43:7 - 44:23 (West).  At that point, however, it was still not clear whether the person or persons who answered the door was Morales-Ortiz.  See id. at 22:3-7 (West).  In addition, while waiting outside, West observed two cars in the driveway of the residence. See id. at 12:15 - 13:2 (West).  One of the cars had a license plate from Chihuahua, Mexico.  See id.

After waiting approximately an hour and ten minutes to execute the arrest warrant, at around 7:18 a.m., a team of agents forced entry into Morales-Ortiz' residence through the back door.  See id. at 23:4-7 (West).  Because Morales-Ortiz was standing directly behind the door that the entry team breached, the door struck him and he fell to the ground.  See Tr. Mot. to Supp. at 23:8-13 (West); 46:20 - 47:6 (West).  Morales-Ortiz did not physically resist arrest, and Detective Nate Lerner handcuffed Morales-Ortiz while he was lying on the ground and bleeding profusely from a laceration that the falling door caused.  See Tr. Mot. to Supp. at 46:7-19 (West); Tr. Det. at 101:2-6 (West)(November 13, 2003)(hereinafter "Tr. Det.").[2]

Upon entry of the house, while standing near the laundry room, West smelled an odor he believed to be associated with narcotics.  See Tr. Mot. to Supp. at 24:11-25 (West).  West identified the odor as inositol, which, based on his training and experience, is known to be "a commonly used cutting agent for cocaine."  Affidavit in Support of Application ¶ 8, at 8 (hereinafter "Affidavit"); Tr. Det. at 102:8-22 (West).  Morales-Ortiz alleges, however, that Inositol is odorless.  See Defendant's Motion to Suppress, at 204:10 - 206:12 (Alfred Mares, private investigator and retired law enforcement officer).  At the Motion to Suppress hearing, Mares testified that Inositol does not emit

_____

[2] The Court's citations to the transcript of the Detention hearing refer to the Court Reporter's final version.  All page numbers and line numbers are finalized.

-3-

a distinct odor.  See id.  Mares based this opinion on research indicating that Inositol does not have

an odor and his own observations after purchasing two different brands of Inositol and noting that

both products lacked any distinct smell.  See id.  The agents did not discover inositol in Morales-

Ortiz' residence.  See id. at 95:7-12 (West); Tr. Det. at 131:22-23 (West).

      Immediately after entry into Morales-Ortiz' residence, officers conducted a protective sweep

of the two-story residence to make certain there were no other individuals in the house.  See Tr. Mot.

to Supp. at 27:21 - 28:11 (West); Tr. Det. at 101:8-12 (West).  The officers did not discover other

persons in the residence.  See Tr. Mot. to Supp. at 28:21-22 (West).  The protective sweep lasted

for approximately five minutes.  See id. at 28:12-18 (West).

      During the protective sweep, the officers upstairs observed a pager that was vibrating on top

of a dresser in the bedroom.[3]  See id. at 29:2-12 (West); Affidavit ¶ 8, at 8.  Agents took special

interest in the pager because it was not a "regular pager" and could display text messages, and

allegedly displayed a message which stated "run if you can," or "run now."  Tr. Mot. to Supp. at

31:8-14 (West); Tr. Det. at 115:19 - 116:13 (West).  Intel, Morales-Ortiz' employer, had issued the

pager with alphanumeric capabilities.  See Tr. Mot. to Supp. at 83:12-21 (Jeff Barnett, Intel

manufacturing technician).  The Intel-issued pager, however, requires physical manipulation to pull

---

[3]  In his Motion to Suppress, Morales-Ortiz suggests that, before 9:30 a.m., an agent announced that an officer's cell phone had been lost upstairs during the protective sweep and that, when they went upstairs to retrieve it, returned with the pager. See Defendant's Motion to Suppress, at 3; Tr. Det. 115:19-22. At the Motion to Suppress hearing, however, West testified that an officer seized the pager during the initial protective sweep conducted immediately after gaining entry into the residence. See Tr. Mot. to Supp. at 29:2-12 (West). Although Morales-Ortiz testified at the Motion to Suppress hearing that an officer stated that he had lost his cell phone upstairs and went up to retrieve it, Morales-Ortiz also stated that he did not see the pager. See Tr. Mot. to Supp. at 165:13 - 166:8 (Morales-Ortiz); 170:1 - 171:2 (Morales-Ortiz). The Court finds, therefore, that the agents seized the pager during the protective sweep.

up a text message.  See Tr. Mot. to Supp. at 31:15-24 (West); 85:17 - 86:1 (Barnett).  At the hearing, there was testimony that pages stating "run if you can" or "run now" are common text messages for Intel electronics technicians.  See id. at 86:12 - 87:12 (Barnett).

Paramedics arrived at approximately 7:40 a.m. to treat Morales-Ortiz' injury.  See id. at 164:24 - 165:8 (Morales-Ortiz, Defendant).  At approximately 7:55 a.m., West read Morales-Ortiz his Miranda warnings, and he invoked his right to speak with his attorney.  See Tr. Det. at 101:114-125 (West).  West asked Morales-Ortiz for consent to search the house, but Morales-Ortiz refused. See Tr. Det. at 102:2-3 (West).  At approximately 10:15 a.m., officers transported Morales-Ortiz to the hospital for treatment of his head injury.  See Tr. Mot. to Supp. at 113:2-4 (West); 165:9-12 (Morales-Ortiz).

After officers secured the home, West contacted Agent Tim Davis for the purpose of obtaining a search warrant for the residence.  See Tr. Mot. to Supp. at 127:12 - 128:6 (Agent Tim Davis, Drug Enforcement Administration agent).  While waiting for a search warrant, the agents remained in Ortiz' house to secure the premises and prevent the destruction of evidence.  See Tr. Mot. to Supp. at 36:20 - 37:8 (West).  During this time, Intelligence Analyst Mosley[4] advised West that he observed a cellular telephone on the kitchen counter that was turned on. See id. at 33:14 - 36:6 (West). West directed Mosley to retrieve the telephone numbers from the phone's memory before the battery died.  See id.  Mosley retrieved names and telephone numbers from the cell phone before the execution of the search warrant.  See id.

Contemporaneously with the alleged plain view pager message, agents asked Morales-Ortiz about a "pipe" found in the dresser drawer of his upstairs bedroom.  See Tr. Mot. to Supp. at

_____

[4]  All of the briefings and the transcripts only refer to Mosley by the last name.

109:5 - 112:2 (West).

Magistrate Judge Scott issued a search warrant for the premises, and the search of the house commenced at approximately 11:45 a.m.  See id. at 93:12 - 94:1 (West).  The warrant authorized the seizure of numerous items, including "[a]ny and all paging devices [and] cellular telephones." Application and Affidavit for Search Warrant, signed by Magistrate Judge Robert H. Scott (Case Number 03M0538)(dated October 7, 2003).

## II.    THE SEARCH WARRANT AFFIDAVIT.

Paragraph 7 of the warrant affidavit begins with the statement that, "[o]n October 7, 2003 at approximately 6:10 AM, DEA agents attempted to execute an arrest warrant of Juan M[orales-Ortiz] for conspiracy to distribute 50 grams or more of cocaine base at his home at 1800 Basswood, NW in Albuquerque, NM."  Affidavit, ¶ 7, at 7.  Morales-Ortiz contends that this phrasing would likely have led Judge Scott to believe Morales-Ortiz was being arrested based upon evidence that he was running a drug sales operation from his home.  There is no allegation in the indictment that Morales-Ortiz was running a drug-sales operation from his home, nor does the discovery provided to date indicate such was taking place.  Paragraph 8 details DEA entry into the 1800 Basswood Ct. residence:

> On entry, agents arrested M[orales-Ortiz] and conducted a protective sweep of the home for officer safety.  When conducting the sweep, agents smelled the distinct odor of inositol.  Based upon training and experience a commonly used cutting agent for cocaine.  Inositol is a baby laxative, however, M[orales-Ortiz] has no children at home.  M[orales-Ortiz] also had several surveillance cameras and police scanners in use, along with a body transmitter detector.  Based upon training and experience, I know that individuals who protect distribution quantities of drugs often employ such security equipment in their home or "stash house" to prevent the drugs from being stolen or seized by police.  Agents have secured the dwelling pending review of the application for search warrant.  At approximately 9:30 AM, M[orales-Ortiz] received a text message in plain view on his pager, which said, "Run if you can."  Agents were

simultaneously conducting several arrest warrants at that time and suspect that someone may have been attempting to alert M[orles-Ortiz] to this fact.
Affidavit ¶ 8, at 8.

The affidavit states the protective sweep of the house, including the second floor, was for officer safety, yet Morales-Ortiz contends that no exigent circumstances existed as the officers waited over an hour to execute the arrest warrant.  Morales-Ortiz argues that nowhere in the discovery is there indication that any agent ever suspected the residence contained other suspects, nor is it anywhere indicated that agents believed Ortiz had firearms, nor did he attempt to flee or resist his physical arrest.  Pending the execution of the arrest warrant, the agents casually walked around outside of the residence, knocking on the doors, and looking into the windows.

Again, Morales-Ortiz notes that inositol is odorless, even though there are several affirmations throughout the discovery that many officers smelled this substance.  Morales-Ortiz also contends that inositol is not regularly used as a baby laxative.  See National Institute of Health Household Products Database, available at http://www.nih.gov/ (enter search for "Household Products Database," click on Household Products Database, click on "Ingredients," then enter "Inositol," click on "Inositol" (baby laxative not listed as a common use).  Also, Morales-Ortiz asserts that, contrary to the Affiant's assertions, toys were scattered all around his house, with one room containing children's bunk beds and cartoon character blankets, while another room contained a crib, pampers, and toddler toys.

Morales-Ortiz contends that the Affiant's assertions regarding the "several surveillance cameras" in use is similarly erroneous, as no surveillance cameras were in use at the 1800 Basswood Ct. residence, and no discovery shows any photographs of these alleged cameras, nor were any taken into evidence.  A scanner system did exist, but was not operating when agents entered the residence, as the agents admitted turning it on: "When we turned it on, it was tuned to State Police."  Tr. Det.

at 113:19 - 114:13 (West).  The alleged body transmitter detector did not exist, and went unrecorded

by photograph or seizure into evidence.  And again, Morales-Ortiz alleges that no pager message in

plain view could have existed.

Paragraph 9 details evidence obtained from authorized wire taps of Jose Nunez-Cabrera, "an

indicted crack cocaine trafficker in Albuquerque, New Mexico," dated August 22, 2002 through

October 11, 2002.  The paragraph goes on to state: "During the interception, telephone calls between

N[unez-Cabrera] and M[orales-Ortiz] revealed evidence of drug trafficking conspiracy between the

subjects.  Several of the calls discussed the collection of drug debts conducted by M[orales-Ortiz]

which he subsequently provided cash to N[unez-Cabrera] intended for the purchase of cocaine."

Affidavit ¶ 9, at 8.

Morales-Ortiz argues that this information was over a year old at the time it was used to

establish probable cause, with the last recorded conversation between these individuals occurring on

October 3, 2002.  Calls were recorded between Morales-Ortiz and Nunez-Cabrera from August 24,

2002 through October 3, 2002,[5] none of which recorded the men discussing collection of drug debts

by Morales-Ortiz and subsequently providing cash to Nunez-Cabrera for the purchase of cocaine.

Instead, Morales-Ortiz contends that the law enforcement interpreted the intercepted calls to be part

of a drug-trafficking conspiracy.

Paragraph 10 is evidence obtained through a statement of a cooperating defendant ("CD"),

cooperating for prosecutorial consideration related to a recent drug trafficking offense.  The CD

is believed to be reliable and truthful based upon independent corroboration of his/her

---

[5]  Defendant's Motion to Suppress states that the calls were recorded between October 24, 2002 to October 3, 2002.  In light of the dates supplied by the government, the Court will assume the Defendant meant August 24, 2002 to October 3, 2002.

> statements through other investigative methods and sources.  The CD stated that he/she had contact with Juan M[orales-Ortiz] during his/her relationship with Humberto HERNANDEZ.    The CD claimed that M[orales-Ortiz] was HERNANDEZ'[] principal source for cocaine.  The CD stated M[orales-Ortiz] provided him/her with 2 kilograms of cocaine during one of the CD's visits to HERNANDEZ.  The CD stated that M[orales-Ortiz] drove a black Lincoln LS sedan. Agents observed a black Lincoln sedan in M[orales-Ortiz'] driveway on the morning of October 7, 2003.  The CD believed that M[orales-Ortiz] worked as a technical support specialist at a computer or telecommunications provider in Albuquerque, NM. The CD positively identified Juan M[orales-Ortiz] from a photograph.

Affidavit ¶ 10, at 8-9.  Despite stating the date the CD was debriefed as September 16, 2003, the affidavit gives no information as to the dates of the alleged information obtained from the CD. Morales-Ortiz contends that, without this information, Judge Scott had no ability to determine whether the CD's information was stale or to test the Affiant's actual knowledge of the CD's alleged reliability.  Further, the alleged activity did not occur at Morales-Ortiz' residence, but at another location unrelated to Morales-Ortiz.  To establish and corroborate the CD's reliability, the information that was put to Judge Scott related to a black Lincoln, and Morales-Ortiz alleges that this information was inaccurate.

West testified that the black Lincoln was not in the driveway, but rather in the garage; the Affiant's affirmation is otherwise.  See Tr. Det. at 123:3 - 225:19 (West).  Further, the employment information regarding Morales-Ortiz was also inaccurate.  Finally, Morales-Ortiz contends that identification of any individual from a photograph establishes little without information as to the circumstances surrounding the identification, such as how the photograph was presented to the CD, whether it was part of a photograph array, and whether the identity was suggested to the CD before the identification.

During the search of 1800 Basswood Ct., law enforcement officers discovered receipts in

Spanish, which they inferred to be from recent travel to Mexico; photographs of Morales-Ortiz in possession of a firearm; a "large amount" in United States currency, and two handguns.  <u>See</u> Tr. Det. at 105:20 - 106:18; 117:13 - 118:11.  None of these items were illegal for Morales-Ortiz to possess. Agents also  alleged discovery of water on the laundry room floor and surmised the Morales-Ortiz had disposed of a quantity of cocaine in the washing machine.  <u>See id.</u> at 109:4-10.  No photograph in evidence, however, shows water on the laundry room floor.  <u>See</u> 126:2-20 127:13-19.  West testified that a photograph exists of a positive field test result for cocaine in the washing machine, <u>see id.</u> at 109:16 - 110:17 (West), but, according to Morales-Ortiz, the later laboratory test determined that the residue from the washing machine contained "no controlled substance,"  <u>see</u> Defendant's Motion to Suppress at 9.[6] Additionally, agents discovered what they characterized as packaging and an ammunition magazine in a floor vent near the washing machine.  <u>See id.</u> at 106:1-20.

The search pursuant to the warrant resulted in the following seizures: (i) possible kilogram wrapping/plastic tape; (ii) misc paperwork/documents; (iii) two guns; (iv) two telephones; (vi) scanner system; (vii) Pepsi can w/ false compartment; (viii) unknown amount of U.S. Currency (actually $1,021.00); (ix) GE washing machine part; (x) electronic address book; and (xi) misc New Mexico LP's.  <u>See</u> Tr. Det. at 105:18 - 117:23 (West).

## PROCEDURAL BACKGROUND

Morales-Ortiz moves, pursuant to the Fourth Amendment of the United States Constitution, for an order suppressing the all evidence obtained from the protective sweep of his residence following his arrest on October 7, 2003.  He also asks the Court to suppress as well all evidence

---

[6]  There is no evidence in the record that to support the contention that the follow-up laboratory test did not reveal a positive test for cocaine.  The Court, therefore, cites only to the portion of Morales-Ortiz' motion containing this reference.

obtained from the subsequent residential search based upon an unconstitutional warrant.

## FOURTH AMENDMENT LAW

### I. PROTECTIVE SWEEPS.

The Supreme Court of the United States in Chimel v. California, 395 U.S. 752 (1969), authorized officers to search the arrestee's person and any area in his immediate control to protect them from danger and to prevent the destruction of evidence.  See id. at 762-63.  In contrast, a protective sweep of the residence would be allowable pursuant to a valid arrest, but it, too, is a restrictive search.  See Maryland v. Buie, 494 U.S. 325, 327 (1990).  A protective sweep is a quick and limited search of the premises conducted to protect the safety of the officers or others, and is narrowly confined to a visual inspection of those places where a person might be hiding.  See United States v. Parra, 2 F.3d 1058, 1066 (10th Cir. 1993)(citing Maryland v. Buie, 494 U.S. at 327).

The officers must show "specific and articulable facts, which, taken together with reasonable inferences from those facts, warranted the officer[s] in believing the area to be swept harbored an individual posing a danger to the officer or others."  United States v. Carter, 360 F.3d 1235, 1242 (10th Cir. 2004).  "Of course, there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in Buie."  Id. at 1242-43.

### II. PLAIN VIEW.

Agents or officers may seize evidence without a warrant if it is in plain view.  See Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971).  Three requirements mus be met to justify the warrantless seizure of evidence in plain view: (i) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (ii) the item's incriminating

-11-

character is immediately apparent; and (iii) the officer has a lawful right of access to the object itself.

See Horton v. California, 496 U.S. 128, 136-37 (1990).

## III.     SEARCHES OF CELL TELEPHONES AND PAGERS.

An individual has an expectation of privacy in an electronic repository for personal data, including cell telephones and pager data memories.  See United States v. Chan, 830 F.Supp. 531, 534-35 (N.D. Cal. 1993).  Because of this recognized expectation of privacy, officers must obtain a warrant to search the memory of such devices, unless a recognized exception to the warrant requirement exists.  See Chimel v. California, 395 U.S. at 763.

## IV.     SEARCH WARRANTS.

A search warrant must be based on probable cause, which a reviewing court determines by examining the affidavit supporting the warrant.  See United States v. Tisdale, 248 F.3d 964, 970 (10th Cir. 2001).  The court determines the warrant's "sufficiency . . . by looking at the totality of the circumstances and simply ensuring 'that the magistrate had a substantial basis for concluding that probable cause existed.'"  See id. (quoting Illinois v. Gates, 462 U.S. 213, 238-239 (1983)). "Probable cause exists 'only when the supporting affidavit sets forth facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Jardine, 364 F.3d 1200, 1204 (10th Cir. 2004)(quoting United States v. Basham, 268 F.3d 1199, 1203 (10th Cir. 2001)).  Reviewing courts must afford great deference to a magistrate judge's probable cause determination.  See United States v. Nolan, 199 F.3d 1180, 1182 (10th Cir. 1999).

An affidavit in support of a search warrant cannot include false statements made knowingly and intentionally, or with a reckless disregard for the truth. See Franks v. Delaware, 438 U.S. 154,

155-56 (1978).  The false statement must be "necessary to the finding of probable cause" for the fruits of the search to be suppressed.  Id. at 155.  The defendant bears the burden of demonstrating the affidavit's falsity or reckless disregard for the truth by a preponderance of the evidence.  See United States v. Kennedy, 131 F.3d 1371, 1376 (10th Cir. 1997).

If a court strikes a portion of an affidavit that is not necessary to the finding of probable cause, then the court may uphold that warrant without a Franks hearing.  See id. at 1377 (holding that a court may uphold a warrant without a Franks hearing when a portion of an affidavit is not necessary to the determination of probable cause).

## V.   WARRANTLESS SEARCHES UNDER THE FOURTH AMENDMENT.

"It is a basic 'principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  Payton v. New York, 445 U.S. 573, 586 (1980)(citing Coolidge v. New Hampshire, 403 U.S. 443, 477-78 (1971)).  There are, however, several recognized exceptions that justify warrantless searches.  One of these exceptions allows officers to conduct a warrantless search if probable cause and exigent circumstances exist.  See Kirk v. Louisiana, 536 U.S. 635, 638 (2002); United States v. Najar, No. CR 03-0735 (D.N.M. July 7, 2004)(Browning, J.).  The Tenth Circuit has established a three-part test for determining whether exigent circumstances exist.

> [T] he basic aspects of the exigent circumstances exception are that (1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others , (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.

United States v. Rhiger, 315 F.3d 1283, 1288 (10th Cir. 2003)(citations omitted).  Fourth

-13-

Amendment law does not allow law enforcement officers to create an exigency and then rely upon it for a warrantless search.  See United States v. Flowers, 336 F.3d 1222, 1230 (10th Cir. 2003).

## VI.   GOOD FAITH EXCEPTION.

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court of the United States held that a good faith exception to the warrant requirement applies when police officers act in reasonable reliance on a search warrant, which was issued by a neutral and detached magistrate but ultimately found to be defective.  See id. at 919-20.  Under the good faith exception, even though the warrant on which the search was based was defective, the evidence obtained by the officers reasonably executing the warrant should not be excluded.  See id.  The good faith exception applies when an officer has a good faith but incorrect or mistaken belief regarding a fact.  See United States v. Salines-Cano, 959 F.2d 861, 865 (10th Cir. 1992)(quotation omitted)("[T]he Fourth Amendment does not invalidate warrantless searches based on a reasonable mistake of fact . . ..").

## VII.   DOCTRINE OF INEVITABLE DISCOVERY.

If an independent investigation would have inevitably led to the discovery of the evidence, the evidence is properly admitted.  See United States v. Souza, 223 F.3d 1197, 1202-03 (10th Cir. 2000).  The exclusionary rule is not designed to place police officers and prosecutors in a worse position than they would have been had the Fourth Amendment violation not occurred.  See United States v. Eylicio-Montoya, 70 F.3d 1158, 1165 (10th Cir. 1995).

## ANALYSIS

## I.   THE PROTECTIVE SWEEP WAS LEGAL IN INCEPTION AND REASONABLY LIMITED IN SCOPE.

The initial "protective sweep" was constitutional as it was based on probable cause that there

-14-

may have been other individuals located inside the house.  During the hour that the officers attempted to gain entry into the residence, the agents spoke with an unidentified person on at least three occasions.  Because of the obscured view through the screen door, it was not clear if the agents spoke with the same person on each occasion, or if that person was Morales-Ortiz.  The person at the door furthered the belief that more than one person may be in the house by telling the agents that he was not Morales-Ortiz, or that Morales-Ortiz was upstairs sleeping or at work.  In addition, West observed two different color shirts through the screen door on the separate occasions the unidentified male spoke to the officers through the screen door.  The agents also observed two cars in the driveway.  These occurrences gave the officers reasonable, articulable cause to believe that another person or persons may have been present in the residence, and the protective sweep was, therefore, lawful under the Fourth Amendment.

## II.    THE COURT NEED NOT DECIDE WHETHER THE WARRANTLESS SEARCHES OF THE CELL PHONE AND PAGER WERE UNCONSTITUTIONAL.

Because the agents conducted warrantless searches and seizures of the cell phone and the pager, the information retrieved from the devices is admissible only if one of the warrant exceptions -- or the doctrine of inevitable discovery -- apply.

During a lawful protective sweep, the officers may only seize evidence that is within plain view.  Accepting, *arguendo,* that the Court may consider the cell phone and the pager contraband, see United States v. Moore, 17 F.3d 1437,1994 WL 52640, at **7 (10th Cir. 1994)(unpublished decision);  United States v. Martinez, 938 F.2d 1078, 1083-84 (10th Cir. 1991), agents properly seized the pager and the cell phone under the doctrine of plain view.

The plain view doctrine, however, only permits the officers to seize the items.  Because the

-15-

pager required manipulation to read the allegedly incriminating message, the court will assume without deciding that the manipulation exceeded the scope of the plain view doctrine.[7]  The Court will assume that the pager, therefore, is inadmissible on the basis of plain view; it must come in, if at all, under the doctrine of inevitable discovery.

Similarly, after seizing the cell phone, the officers manipulated it to record names and phone numbers from the phone's memory.  In support of its position that immediate retrieval of the information from the cell phone was necessary to preserve the evidence, the United States relies on United States v. Parada, 289 F.Supp.2d 1291, 1303-04 (D. Kan. 2003).  In United States v. Parada, the United States District Court for the District of Kansas held that circumstances justified an officer's warrantless search of a cell phone's memory to retrieve the incoming phone call list.  As the court explained:

> [T]he evidence indicated that exigent circumstances justified the retrieval of the phone numbers. Because a cell phone has a limited memory to store numbers, the agent recorded the numbers in the event that subsequent incoming calls effected the deletion or overwriting of the earlier stored numbers. This can occur whether the phone is turned on or off, so it is irrelevant whether the defendant or the officers turned on the phone. The Court concludes that under these circumstances, the agent had the authority to immediately search or retrieve, as a matter of exigency, the cell phone's memory of stored numbers of incoming phone calls, in order to prevent the destruction of this evidence.

Id.

In this case, West testified that he believed that retrieval of the phone's information was necessary to prevent losing such evidence if the phone battery died.  The United States, however,

---

[7]  Exigent circumstances do not justify the retrieval of the pager's message.  Even assuming the exigent circumstances doctrine allows a warrantless search to protect evidence, the United States did not offer any evidence to support its assertion that immediate retrieval of the message was necessary to preserve the evidence.  See United States v. Rhiger, 315 F.3d at 1288.

does not point to evidence indicating that Mosley only recorded the incoming call list, as in <u>United States v. Parada</u>. Instead, West testified that Mosley retrieved phone numbers and names, suggesting that the officer retrieved information stored in the phone book's memory. The evidence, therefore, is not as clear as the situation in <u>United States v. Parada</u>, and, in this case, does not justify a finding of exigent circumstances. The Court assumes without deciding that there is no justification for the manipulation of the cell phone to retrieve the names and numbers from the phone's memory.

Nor does the search incident to arrest exception apply. Neither the cell telephone nor the pager were on Morales-Ortiz' person. <u>See</u> <u>United States v. Reyes</u>, 922 F.Supp. 818, 833 (S.D.N.Y. 1996).

## III.   THE WARRANT, DESPITE ITS DEFECTS, CONTAINED PROBABLE CAUSE TO SEARCH THE RESIDENCE.

In his Motion and at the hearing, Morales-Ortiz highlighted several mistakes contained within the affidavit in support of the search warrant for Morales-Ortiz' residences. Such inaccuracies include: (i) that inositol has an odor, as well as that inositol is commonly used as a baby laxative; (ii) that he has no children at home; and (iii) that there were several surveillance cameras and a body transmitter detector in the house. In addition, the pager message displaying "run if you can" was unlawfully seized and, therefore, cannot be used in support of the finding of probable cause.

Even if the Court were to strike all of the mistakes alleged by Morales-Ortiz from the affidavit that could have misled Judge Scott in his finding of probable cause to issue the search warrant, the Court finds that there was still probable cause on which to issue the warrant. <u>See</u> <u>United States v. Kennedy</u>, 131 F.3d at 1377. In particular, West's testimony that he smelled a chemical associated with narcotics, even if inaccurate as to which chemical in particular, as well as the information

obtained from the wire taps, is a sufficient basis to create probable cause for the issuance of the warrant.

## IV.   EVEN IF THE WARRANT LACKED PROBABLE CAUSE, THE GOOD FAITH EXCEPTION APPLIES.

The agents involved in collecting the information and compiling the affidavit in support of the search warrant concede that mistakes occurred.  After listening to the officers testify, and after observing them on the stand, the Court is convinced that such mistakes were not knowingly or intentionally made; at most, the mistakes were a result of the officers being negligent as to the details while a number of warrants were executed simultaneously at different locations.  Therefore, even if the warrant was defective in that it lacked probable cause, the fruits of the search are admissible under the good faith exception to the warrant requirement.

## V.   THE CELL PHONE AND PAGER ARE ADMISSIBLE BASED ON THE DOCTRINE OF INEVITABLE DISCOVERY.

Even though the cell phone and pager were unlawfully searched, the contents are admissible based on the doctrine of inevitable discovery.  Because the pager and the cell phone would have been searched legally pursuant to the search warrant that was issued, discovery of the information contained in the pager and the cell phone would have been discovered inevitably.[8]  Therefore, the information obtained from the pager and the cell phone are admissible.

**IT IS ORDERED** that the Defendant's Motion to Suppress is denied.

---

[8]  Because neither party raised the argument that the agents needed a separate warrant to search the pager and cell phone's memory, the search warrant obtained by the agents, which allowed for the seizure of all pagers and cell phones, is sufficient to find the information retrieved from such devices admissible under the doctrine of inevitable discovery.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

David Iglesias
  United States Attorney
Erlinda O. Johnson
  Assistant United States Attorney
Albuquerque, New Mexico

  _Attorneys for the United States_

Joe M. Romero, Jr.
Jody Neal-Post
Albuquerque, New Mexico

  _Attorneys for the Defendant_